# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CURTIS DELAY BROWN, | ) |
| Petitioner, | ) ) |
| | ) Criminal Docket 2:12-cr-00224 |
| v. | ) ) Civil Docket 2:17-cv-01339 |
| | ) |
| UNITED STATES OF AMERICA. | ) ) |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Before his jury trial on a federal felon-in-possession of a firearm charge, Petitioner Curtis Delay Brown told his lawyer about two (2) witnesses who were willing to testify in his defense. Brown's lawyer interviewed those potential witnesses, weighed the content and credibility of their potential testimony, and ultimately decided against calling them at Brown's trial. Instead, Brown's lawyer argued to the jury that the Government failed to prove Brown's guilt beyond a reasonable doubt—a strategy that he believed Brown's proposed witnesses might undermine.

In the end, the jury convicted Brown, who now brings a Motion to Vacate Sentence under 28 U.S.C. § 2255. Brown argues that by not calling his two (2) proposed witnesses, his attorney provided ineffective assistance of counsel. After reviewing the Record and holding an evidentiary hearing, the Court cannot agree with Brown's claim. Brown's attorney made an informed strategic decision not to call the two (2) potential defense witnesses at trial. And the Court must give Brown's attorney's informed strategy a "virtually unchallengeable" presumption that it fell within the wide range of reasonable professional conduct. Because Brown cannot overcome that strong presumption of reasonableness, his Motion to Vacate Sentence (ECF No. 221), is **DENIED**.

1

I.  **BACKGROUND & FACTUAL FINDINGS**

In August 2012, a federal grand jury returned a one-count indictment charging Curtis Delay Brown with unlawfully possessing a firearm under 18 U.S.C. § 922(g)(1). (Indictment, ECF No. 19.) Represented by Assistant Federal Public Defender Akin Adepoju, Brown took his case to trial and a jury found him guilty. (ECF No. 97.)[1] After sentencing, Brown directly appealed his conviction claiming that the district judge incorrectly admitted harmful prior acts evidence under Federal Rule of Evidence 404(b). During that appeal, the Government confessed error, leading the Third Circuit to vacate Brown's conviction. (ECF No. 136.) On remand, still represented by Adepoju, Brown again took his case to a jury. As in Brown's first trial, the jury returned a guilty verdict. (ECF No. 169.) The Court then sentenced Brown to 180 months of imprisonment followed by two (2) years of supervised release. (ECF No. 182.) The Third Circuit later affirmed Brown's conviction and sentence. (ECF Nos. 198 and 199.)

Within one (1) year of his conviction becoming final, Brown filed a pro se Motion to Vacate Sentence under § 2255. (ECF No. 209.) Brown's pro se motion lodged several claims of ineffective assistance by his trial attorney. (*Id.*) Later, after obtaining counsel, Brown filed a supplemental § 2255 motion that dropped some of the ineffective assistance claims Brown raised in his pro se motion. (ECF Nos. 221 and 222.)

Brown's supplemental motion raised two (2) ineffective assistance claims.[2] First, he claimed that Adepoju was ineffective for "failing to properly investigate, subpoena and call at trial known and available material eyewitnesses" who would have testified on Brown's behalf. (ECF No. 22.) Second, the cumulative effect of trial counsel's ineffectiveness in failing to present

---

[1] Docket citations are to Brown's criminal docket at 2:12-cr-224.

[2] Brown's supplemental petition also included a claim that Adepoju improperly dissuaded Brown from taking the stand at trial. But Brown's post-conviction counsel later withdrew that claim. (ECF Nos. 233 and 234.)

evidence in defense requires a new trial. (*Id.*) Because Brown's ineffective assistance claims rely heavily on his trial counsel's alleged strategy—something not readily reflected in the Record—the Court ordered an evidentiary hearing.

Brown's arrest stemmed from a joint federal and state law enforcement raid of an unlicensed nightclub that Brown owned and operated. During that raid, police alleged that they saw Brown stuff something in the seat cushions of a couch near where he was standing. Police recovered a handgun from the couch cushions and arrested Brown for unlawful possession of a firearm. At the time of the raid, Brown's club was dark and chaotic. Both of Brown's proposed witnesses were at the nightclub on the night of the raid and offered to testify that Brown did not have a firearm that evening.

At the post-conviction evidentiary hearing, four (4) witnesses testified: Brown, Adepoju, and the two (2) proposed witnesses that Adepoju did not call at trial—Eugene Fulmore and Jerald Robinson. Here are the Court's factual findings for each witness' relevant testimony, based on its careful consideration of that testimony both as stated in the context of all of the admissible evidence, and with the benefit of the Court's personal observation of their testimonial demeanor:

## A. Eugene Fulmore—Potential Witness

The first witness that Brown argues his attorney should have called during trial is Eugene Fulmore. Brown and Fulmore first met in 2004, when Fulmore took his car to an auto repair business Brown operated. (ECF No. 269, at 11:14–12:18.) At the time of Brown's second trial, Fulmore, a Marine Corps veteran, worked for an airplane refueling service and had no criminal record. (*Id.*) Fulmore and Brown struck up a friendship after their introduction in 2004, and eventually joined the same motorcycle club—Sin City Cycles. (*Id.* at 12:18–25.)

Fulmore was at Brown's nightclub on the night of the raid. (*Id.* at 13:15–15:15.) Fulmore

3

testified that Brown was in the "VIP section" when the police showed up. (*Id.*) And he described the VIP section as somewhat elevated above the rest of the nightclub. (*Id.*) But Fulmore also testified that he was not in the VIP section with Brown when the police first entered the building. (*Id.*) And he testified that the lighting was "real dim." (*Id.*) What's more, Fulmore testified that he was twenty (20) feet away from Brown when he first saw the police. (*Id.* at 15:16–19.) Fulmore told the Court that he approached Brown as the police came closer, and that he did not see Brown move during that time. (*Id.* at 15:20–16:23.) In fact, Fulmore was adamant that he never saw Brown move or hold a firearm during the police raid. (*Id.* at 17:15–18:24.)

Fulmore then testified about his interactions with Brown's trial attorney—Akin Adepoju. Fulmore remembered meeting with Adepoju ahead of Brown's first trial. (*Id.* at 22:3–23:11.) Adepoju took Fulmore's full account of the night the police arrested Brown. (*Id.*) Then Adepoju told Fulmore he would be in touch if he needed Fulmore as a witness at Brown's trial. (*Id.* at 23:12–24:24.) But Fulmore testified that Adepoju never called him to appear as a witness on Brown's behalf.

At the post-conviction evidentiary hearing, the United States cross examined Fulmore on his connection to Brown. Fulmore admitted that he frequented Brown's illegal bar. (*Id.* at 26:18–22.) And testified that the VIP section was in "total darkness" during the raid. (*Id.* at 27:17–19.) Fulmore also acknowledged that he was not in the VIP section with Brown when the police said they found a handgun Brown stuffed in the couch cushions. (*Id.* at 41:6–7.) And in response to the Court's follow-up questioning, Fulmore noted that he had two (2) beers before he arrived at Brown's nightclub on the night of the raid. (*Id.* at 42:14–24.)

### B. Jerald Robinson—Potential Witness

The second potential witness Brown argues his lawyer should have called is Jerald

4

Robinson. Like Fulmore, Robinson first met Brown when he took his car to Brown's auto repair shop. (*Id.* at 51:20–24.) Eventually, Robinson began working at Brown's nightclub as a security guard—which mostly consisted of patting down patrons for weapons and other contraband at the front door. (*Id.* at 53:10–54:6.) Robinson testified that he arrived at Brown's nightclub sometime after 10:30 PM on the night of the raid. (*Id.* at 53:3–8.)

Robinson told the Court that he patted down roughly forty (40) or fifty (50) patrons that evening. (*Id.* at 53:10–12.) And Robinson told the Court that he took immense pride in his security work. As he put it: "[Patrons] would oftentimes say whenever I did a pat-down, I violated you. I wanted you to feel violated in order for you to feel safe because . . . if you had a pill sandwiched in between your but [sic] cheeks, once I came up, I would find it." (*Id.* at 54:16–20.) Robinson credited his thorough pat down techniques with minimizing violence at the establishments where he worked. (*Id.* at 54:13–15.)

On the night of the raid, Robinson testified that he patted down Brown before Brown entered the nightclub. (*Id.* at 56:12–57:15.) Yet Robinson admitted that he did not know whether Brown had been in the nightclub earlier that evening, and if so, whether Brown went through security screening during that entry. (*Id.* at 69:15–18.) Robinson told that Court that subjecting the owner of an establishment to the same security screening as everyone else was standard procedure at the bars and clubs where Robinson worked. (*Id.* at 56:12–57:15) This is because the owner wants to set a good example for employees—showing that everyone has to go through the security screening. (*Id.*) And Robinson testified that Brown did not have any weapons with him when he went through security to enter the building—since Robinson personally searched him. (*Id.*) When the police raided Brown's nightclub, Robinson testified that he was not present in the nightclub. (*Id.* at 67:11–12.) So Robinson did not witness the police arrest Brown or recover the handgun

5

Brown allegedly possessed.

Like Fulmore, Robinson told the Court that he met with Adepoju ahead of Brown's trial. (*Id.* at 58:8–61:3.) Robinson testified that Adepoju interviewed him, took his detailed statement about the night of the raid, and told Robinson to come to the courthouse for the day of Brown's first trial. (*Id.*) Robinson testified, however, that he was not present for Brown's second trial. (*Id.*)

On cross examination, Robinson acknowledged that he was not the only security guard working the door on the night of the raid. (*Id.* at 69:13–14.) And while Robinson testified to his rigorous pat down techniques, he pointed the finger at the performance of the other security guards to explain how the police nonetheless found thirty-three (33) caches of methamphetamine, a knotted bag of crack cocaine, eight (8) baggies of marijuana, and six (6) baggies of heroin in the club during the raid. (*Id.* at 68:13–25.)

### C. Akin Adepoju—Trial Defense Counsel

With consent from all parties, Akin Adepoju testified by video conference during the post-conviction evidentiary hearing. (*Id.* at 9:1–18.) Although he is currently an Assistant Federal Public Defender in the District of Delaware, Adepoju served in that same capacity in this District. (*Id.* at 77:24–20.) In his time as an Assistant Federal Public Defender in Pittsburgh, Adepoju represented criminal defendants "in all matters starting from . . . pretarget letter[s] . . . grand jury all the way through trials, initial appearances, verdicts, [and] sentencing." (*Id.* at 78:13–20.) Adepoju also testified that he worked in the trial and capital habeas unit while in this District. (*Id.*)

Adepoju represented Brown from 2012 through 2015—which included Brown's first trial, successful appeal, and second trial. (*Id.* at 78:21–79:19.) During that representation, Adepoju remembered undertaking thorough trial preparation. Part of this preparation involved interviewing potential defense witnesses—including Fulmore and Robinson.

6

Adepoju recalled interviewing Fulmore twice. The first happened over the phone before Brown's first trial. The second time at the Federal Public Defenders' Office ahead of Brown's second trial. (*Id.* at 80:8–82:1.) Adepoju remembered Fulmore telling him during the first interview that "he was working" at Brown's establishment on the night of the raid. (*Id.* at 82:6–14.) And that Fulmore "said he didn't see [the police approach Brown] directly." (*Id.*)

Ahead of Brown's second trial, Adepoju recalled Fulmore meeting with him, Brown, Brown's daughter, and another Assistant Federal Public Defender in Adepoju's office. (*Id.* at 83:2–11.) During that meeting Adepoju went over trial preparation questions with Fulmore to gauge whether he would be a compelling witness. (*Id.* at 83:12–84:1.) During that second interview, Fulmore told Adepoju that he did not see Brown with a handgun the night of the raid, that he was not personally in the VIP section at the time of the raid, and that he never saw Brown move the way the police claimed. (*Id.* at 84:4–85:12.) Adepoju did not subpoena Fulmore for either trial, but that was because Brown could easily get in contact with him and he appeared more than willing to testify. (*Id.* at 85:20–86:21.)

Adepoju's interview with Robinson proceeded along the same lines as his second interview with Fulmore. Adepoju, Brown, Robinson, and another Assistant Federal Public Defender met at Adepoju's office in downtown Pittsburgh. (*Id.* at 87:6–21.) In essence, Adepoju recalls Robinson telling him the same story that Robinson told the Court during the evidentiary hearing: that Robinson was working security the night of the raid; that he patted down Brown that evening and did not find a gun; and that he was not personally present when the police arrested Brown.

Ultimately, Adepoju testified that he decided the best approach involved not calling either Fulmore or Robinson as witnesses at Brown's trials. (*Id.* at 89:2–4.) Instead, Adepoju believed that the Government failed to present a compelling case, so a defense that the Government did not

7

prove Brown's guilt beyond a reasonable doubt offered the best hope of an acquittal. (*Id.* at 89:5–23.) Adepoju also testified that he explained his thinking behind not calling Fulmore or Robinson as witnesses to Brown. (*Id.* at 89:19–90:2.)

Adepoju testified that he believed calling Fulmore or Robinson would cause more harm than good for his "beyond a reasonable doubt" defense. (*Id.* at 90:1–2.) Part of that strategy hinged on the fact that the Government's case was weaker at the second trial after the trial judge excluded certain harmful Rule 404(b) evidence admitted during the first trial. (*Id.* at 90:21–91:19, 106:11–107:3, 111:19–24.) So the strategy of attacking the Government's case presented a real possibility of success.

But Adepoju sensed a serious danger in calling either Fulmore or Robinson. Both potential witnesses "would have been cross-examined [which would make clear] that both of them not only have relationships with Mr. Brown but they had been employed by him in some capacity." (*Id.* at 90:5–13.) And Adepoju was concerned that a jury would not believe Robinson's testimony that Brown, as the owner of the club, actually went through security every time he entered the building. (*Id.*)

That risk of cross examination did not just mean Robinson or Fulmore's testimony would be unhelpful. Rather, Adepoju determined that their testimony could affirmatively harm Brown's chances in front of a jury. (*Id.* at 94:9–95:18.) That is because, in Adepoju's experience as an Assistant Federal Public Defender, putting forward witnesses with credibility problems risked turning the jury against Brown. (*Id.*) And Adepoju's experience taught him that once the defendant starts putting witnesses on the stand, they need to be "really good witnesses." (*Id.* at 114:19–115:23.) Otherwise, the defense runs the risk of appearing dishonest to the jury. (*Id.*)

Adepoju testified that he thoroughly considered what Robinson and Fulmore told him

8

about the night of the raid during his interviews with both men. (*Id.* at 115:24–118:21.) And that he compared that information to Brown's own statements about the raid. (*Id.*) But in the end, he determined that the highest likelihood of success would be attacking the Government's proof, and not presenting defense witnesses whose testimony would be subject to damaging cross examination. (*Id.*) And Adepoju testified that Brown did not fight him on his decision not to call either Robinson or Fulmore. (*Id.*)

### D. Curtis Delay Brown—Petitioner

At the post-conviction evidentiary hearing, Brown took the stand and recalled Adepoju representing him during both of his trials. (*Id.* at 131:19–20.) Brown also recounted the night of the raid. He remembered going through security and being patted down by Robinson. (*Id.* at 132:14–133:23.) And he strenuously denied having a firearm with him at the nightclub that evening. (*Id.*)

Brown described the VIP section where he was at the time of the raid as "an elevated two-step area." (*Id.* at 135:5–136:11.) He remembered going to get drinks before heading to the VIP section and remaining there until the police arrested him. (*Id.*) What's more, Brown testified that he did not know everyone in the VIP section that night because many of the patrons were part of a party that rented the club for the evening. (*Id.* at 136:4–11.)

Brown also described the moments when the police raided the establishment. (*Id.* at 136:16–140:10.) The police moved toward the VIP section and told Brown to raise his hands. (*Id.*) He recalled the police recovering a handgun stuffed between the couch cushions in the VIP section. (*Id.*) Though he denies the gun was his, Brown stated that the police arrested him for possession of a firearm. (*Id.*)

Ahead of his first trial, Brown remembers speaking with Adepoju about potential

9

witnesses. (*Id.* at 140:11–141:5.) And he recalls identifying Fulmore and Robinson as people who could testify on his behalf. (*Id.*) He also recalls being present for Adepoju's pretrial interviews with both Robinson and Fulmore. (*Id.* at 141:6–142:3.) During those interviews, Brown recalls Fulmore and Robinson providing essentially the same statements that they testified to during the post-conviction hearing. And he remembered believing that both Robinson and Fulmore would make good witnesses because neither had a criminal record. (*Id.* at 142:23–143:17.)

Brown testified that he was dissatisfied with Adepoju after the first trial for not calling Robinson or Fulmore as witnesses. (*Id.* at 157:17–159:16.) But when he considered getting a different lawyer, he found that he could not afford to hire private counsel. (*Id.*) So Adepoju remained his attorney for the second trial. (*Id.*) Ahead of the second trial, Brown testified that Adepoju told him to have Robinson and Fulmore on standby in case he needed them to testify. (*Id.* at 147:15–148:23.) But Adepoju later told Brown not to call either Robinson or Fulmore, because he did not need them as witnesses. (*Id.*) And though Brown testified that Adepoju threatened to withdraw as counsel when Brown pushed for Robinson and Fulmore to testify over Adepoju's advice, Adepoju did not testify to any such conversation. (*Id.* at 162:19–164:1.) But Brown did testify that Adepoju was "adamant" that the right decision was to not call Robinson or Fulmore as witnesses. (*Id.* at 156:11–15.)

## II. STANDARD OF REVIEW

Under 28 U.S.C. § 2255, a prisoner in federal custody may collaterally attack a sentence if "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). An evidentiary hearing is required for a § 2255 motion unless the filings and Record of the case

10

conclusively show that the petitioner has no right to relief. *Id.* § 2255(b); *see also Gov't of the V.I. v. Forte*, 865 F.2d 59, 62 (3d Cir. 1989).

## III. <u>DISCUSSION</u>

The Sixth Amendment guarantees every criminal defendant "the Assistance of Counsel for his defence." U.S. Const. amend. VI. Of course, a disinterested person with a law degree would not advance the interests behind the Sixth Amendment's right to counsel. So the Supreme Court held that the Sixth Amendment requires that counsel provide "effective" assistance. *See Strickland v. Washington*, 466 U.S. 668 (1984).

The Supreme Court's *Strickland* decision provides the two-pronged legal standard for examining ineffective assistance of counsel claims. First, the Court asks whether "counsel's representation fell below an objective standard of reasonableness." *See id.* at 688. Second, the Court asks whether the defendant suffered any prejudice as a result of counsel's deficient performance. *See id.* at 693 ("Even if a defendant shows that particular errors of counsel were unreasonable . . . the defendant must show that they actually had an adverse effect on the defense."). To obtain relief under the *Strickland* standard, the petitioner must establish both prongs. *See Buehl v. Vaughn*, 166 F.3d 163, 169 (3d Cir. 1999). So when a petitioner's claim fails on one prong, the court need not examine the other. *See Mathias v. Superintendent Frackville SCI*, 876 F.3d 462, 477 (3d Cir. 2017).

For *Strickland*'s first prong—whether counsel provided deficient performance—"[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. The Supreme Court set a high bar: petitioners must show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. And a court examining counsel's

11

performance "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690.

In recent years, the Supreme Court has reminded clients, counsel, and courts that a defense attorney's tactical choices are the final word on many matters of trial management. *See, e.g., McCoy v. Louisiana,* 138 S. Ct. 1500, 1509 (2018). One such trial choice assigned to counsel is deciding what witnesses to call. *See Gonzalez v. United States,* 553 U.S. 242, 249 (2008). Though counsel must still undertake a reasonable investigation into the facts of the case before making trial decisions. *See Wiggins v. Smith,* 539 U.S. 510, 521–23 (2003).

In *Strickland,* the Supreme Court made clear that its decision was not meant as a mechanism to second-guess all of defense counsel's trial decisions. *Strickland,* 466 U.S. at 689. To the contrary, the Supreme Court mandated courts apply "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana,* 350 U.S. 91, 101 (1955)). As part of this discussion, the Supreme Court identified two (2) types of strategic decisions. First, the Court stated that defense counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690. Second, the Court noted that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91.

Our Court of Appeals reads *Strickland* to "reveal[] a tiered structure with respect to *Strickland*'s strategic presumptions." *Thomas v. Varner,* 428 F.3d 491, 499 (3d Cir. 2005). The lower tier is the so-called "weak presumption" that "counsel's conduct might have been part of a

sound strategy." *Id.* In the Third Circuit's view, *Strickland* gives that "weak" presumption to virtually all of counsel's decisions. On the other hand, when the Government—defending a conviction on collateral review—can show "that counsel actually pursued an *informed* strategy . . . the 'weak' presumption becomes a 'strong' presumption. *Id.* at 500. That "strong" presumption, as *Strickland* held, is "virtually unchallengeable." *Id.* (quoting *Strickland*, 466 U.S. at 690). Trial counsel's tactical decision, therefore, will not provide the basis for an ineffectiveness finding unless counsel's decisions were not reasonably designed to serve the defendant's best interest. *Werts v. Vaughn*, 228 F.3d 178, 190 (3d Cir. 2000) (citing *Strickland*, 466 U.S. at 690–91).

The Third Circuit articulated two (2) ways for a petitioner to overcome the "weak" presumption. First, the petitioner can show that "the suggested strategy (even if sound) was not in fact motivating counsel." *Id.* at 49. In the alternative, the petitioner could show "that [defense counsel's] actions could never be considered part of a sound strategy." *Id.* But Third Circuit has not articulated how a petitioner can overcome the "strong" presumption—perhaps an acknowledgment that doing so is nearly impossible.

Here, the Court's first task is to determine whether Adepoju's decision not to call Fulmore and Robinson was a trial management decision assigned to the attorney. The Court easily concludes that it is. The Supreme Court has held that calling witnesses is a decision left to counsel, not the defendant. *See Gonzalez*, 553 U.S. at 249. So Adepoju was the person charged with making the call on what witnesses to present and overarching strategy to pursue.

Next the Court asks whether Adepoju made a *strategic* decision not to call Fulmore and Robinson as witnesses. Again, the answer is simple. *Strickland* requires reviewing courts to presume that challenged actions might be part of a trial strategy. *See Strickland*, 466 U.S. at 689. In Brown's case, *Strickland*'s presumption aligns with the Record developed during the post-

13

conviction evidentiary hearing. There, Adepoju testified that his decision not to call Fulmore and Robinson was actually part of an overarching strategy to avoid affirmatively putting on a case and instead chipping away at the Government's proof. (ECF No. 269, at 93:18–98:7.) So it makes good sense to categorize Adepoju's decision as "strategic."

Having concluded that Adepoju's decision was strategic, the Court must determine whether the "weak" presumption or "strong" presumption applies in Brown's case. Based on the Record, the Court easily concludes that Adepoju decided not to call Fulmore and Robinson as witnesses after a thorough investigation of the relevant law and facts—in other words, an *informed* strategy.

Adepoju did exactly what Third Circuit and Supreme Court case law ask of defense attorneys. He studied the evidence, interviewed witnesses, and developed a reasonable strategy to defend his client at trial. All the witnesses at the evidentiary hearing testified about Adepoju conducting witness interviews. Indeed, Adepoju credibly testified about his interviews of both Fulmore and Robinson before Brown's second trial. (*Id.* at 80:8–85:19, 87:6–89:18.) During his interviews with both potential witnesses, Adepoju listened intently to the testimony each might provide. (*Id.*) And Adepoju compared that testimony to Brown's statement about the night of his arrest. (*Id.* at 83:21–84:1, 87:22–88:11.)

Adepoju also testified that he weighed the credibility of both Fulmore and Robinson's potential testimony. As a result, Adepoju decided that both Fulmore and Robinson had potentially serious credibility issues. (*Id.* at 90:3–17.) That is because Adepoju believed that "testimony would have come out [that] made it clear that both of them not only have relationships with Mr. Brown but they had been employed by him in some capacity"—something Adepoju believed a jury would hold against Brown. (*Id.*)

What's more, Adepoju determined that putting Fulmore and Robinson on the stand might

14

do more than not help Brown's chances, but rather make things much worse. (*Id.* at 90:3–17, 94:9–95:18.) Adepoju testified that two (2) factors about Fulmore and Robinson caused him concern. First, "they were not within the area where the police saw the alleged crime, the firearm, [or] the movement." (*Id.* at 94:19–21.) Second, Adepoju testified that Robinson and Fulmore were ripe for damaging cross examination by the prosecution about their bias, personal friendship, and past financial relationships with Brown. (*Id.* at 95:2–18.) And he did not think a jury would believe Robinson's testimony that Brown went through security every time he entered the club he owned. (*Id.*)

During the evidentiary hearing, Adepoju testified about his strategic thinking heading into Brown's second trial. Adepoju testified that he felt Brown was in a strong position after the Government conceded that the district judge incorrectly admitted damaging Rule 404(b) evidence during the first trial. (*Id.* at 111:12–24.) With that harmful evidence out, Adepoju determined the best strategy was to thoroughly cross examine the police, given how dark and chaotic the lounge was during the raid—i.e., a "reasonable doubt" defense. (*Id.* at 91:1–19, 113:1–8.)

Adepoju testified that the "reasonable doubt" defense was not some brand-new concept developed for Brown's trial. Rather, it was an established trial tactic used by defense attorneys. (*Id.* at 114:19–116:3.) In his experience as an Assistant Federal Public Defender, Adepoju testified that presenting weak witnesses during a "reasonable doubt" defense has a deleterious effect. (*Id.*) In essence, Adepoju testified that if both the Government and defense put on witnesses, the jury will go with whichever side presented the more credible witnesses. (*Id.*) So if the strategy is "reasonable doubt," Adepoju testified that any defense witnesses need to be "really good witnesses." (*Id.*) Reasonable defense attorneys might differ on that assessment, but Adepoju's years as an Assistant Federal Public Defender and preparation for Brown's case led him to that

15

conclusion.

But Adepoju did not dismiss calling Robinson and Fulmore out of hand. Instead, he told Brown to have them available on standby for the trial. In the Court's estimation, this too counts as strategic thinking. If Adepoju simply said "no" to calling Robinson and Fulmore it would be one thing. But here, he interviewed each man, considered their testimony, considered their vulnerability, and made a conditional decision not to call them as witnesses. Yet he kept the door open to calling them if the need arose at trial. But when the Government rested, Adepoju looked at the Government's case and decided that calling Fulmore and Robinson would present more risk than benefit.

Nothing in Brown's petition or the Record suggests that Adepoju's claimed strategy is merely a post-hoc justification for not calling Fulmore and Robinson. To the contrary, Adepoju's credible testimony during the hearing affirmatively shows that his claimed strategy really was his strategy during Brown's second trial. The Court, therefore, concludes that Adepoju engaged in an informed strategy when he decided what evidence to present and witnesses to call at Brown's second trial. As a result, his decision is entitled to a "strong" presumption of professional reasonableness. *See Varner*, 428 F.3d at 499–50. A "strong" presumption, the Supreme Court says, is "virtually unchallengeable." *Strickland*, 466 U.S. at 690. And the Record does not convince the Court that Brown made the nearly monumental showing required to override the "strong" presumption of reasonableness. If anything, the Record suggests that Adepoju's tactical decisions were reasonably designed to advance Brown's best interests. *See Werts*, 228 F.3d at 190. Because the Record leaves the Court convinced that Brown cannot establish *Strickland*'s deficient performance prong, the Court will not examine the prejudice prong.

## IV. CERTIFICATE OF APPEALABILITY

To appeal from a final order in a § 2255 proceeding, the petitioner must obtain a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B). A certificate of appealability "may issue only upon 'a substantial showing of the denial of a constitutional right.'" *Michael v. Horn*, 459 F.3d 411, 418 n.9 (3d Cir. 2006) (quoting 28 U.S.C. § 2253(c)(2)). When the Court denies the petition on the merits of the claims, the petitioner must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Brown's petition does not make that showing. So the Court will not issue a certificate of appealability for Brown's ineffective assistance of counsel claim.

## V. CONCLUSION

The Court concludes that the files and Record in this case conclusively show that Brown is not entitled to relief under § 2255. Brown is unable to meet *Strickland*'s requirement that his attorney provided deficient performance. Brown's Motion to Vacate Sentence Under 28 U.S.C. § 2255, is therefore **DENIED**, and no Certificate of Appealability shall issue, for the reasons stated.

Mark R. Hornak
Chief United States District Judge

Dated: March 4, 2020
cc: All counsel of record via ECF